## WILLIS MERCANTILE CO. v. MOODY et al.

### No. 2620.

Court of Civil Appeals of Texas. Beaumont.

Nov. 28, 1934.

Crawford & Crawford, of Conroe, for appellant.

Pitts & Liles, of Conroe, for appellee.

WALKER, Chief Justice.

This suit was instituted in the district court of Montgomery county by appellant, Willis Mercantile Company, a corporation, against W. E. (Ernest) Moody and H. A. (Hobby) Moody, as partners, to recover the balance due on an account in the sum of $549.59. Appellant pleaded partnership both in fact and by estoppel. W. E. Moody made no defense. H. A. Moody answered denying the partnership under oath. On an instructed verdict judgment was entered for appellant against W. E. Moody for the amount of the account and for H. A. Moody that he was not a member of the partnership.

The contention made by appellant on this appeal is that the evidence was sufficient to raise the issues of partnership as pleaded by it. We agree with that contention on the following summary of the testimony offered by appellant, questions and answers reduced to narrative:

R. E. Watson, appellant's president, testified:

"Mr. H. A. Moody came in the store one day and checked the Willis Mercantile Company books personally with me, and I asked him why he wanted to check it and he said he wanted to see what Ernest Moody was doing inasmuch as he and Ernest Moody were partners; and he checked the account.

"* * * The account was carried in the name of W. E. Moody. On the 19th of July the amount—now Hobby had raised some objection about some personal stuff of W. E. Moody's being on this account and on July 19th the amount charged to H. A. Moody of $154.55; July, 1930. Now on the 19th of July this $154.55 was transferred to H. A. Moody's account and credited on W. E. Moody's, leaving a balance of $51.80, the amount still being charged to W. E. Moody; that being the amount they agreed on. That amount of $51.86. Here it is right here; the amount of the transaction. See right here. That amount of $51.86 is still being charged to Mr. Moody. After allowing that credit the amount I sue for is $549.76."

W. E. Moody testified:

"We were equal partners in two heads of mules and one truck. He had sold the Ford truck to my brother. He traded the Chevrolet for an International; I bought one-half interest in two head of mules and one truck. I was to pay him one-half of $1800.00 for the truck and trailer and two head of mules. I didn't pay him anything down but I was to pay him out of the earnings of the truck; so much monthly or whatever I had to spare. I was to pay him all of it, and did pay him some along. I was engaged in the logging business for J. S. Hunt and Colson Lumber Company. It would be hard to tell where I was getting my timber from; in a general way, from Ellis O. Walline timber, Mr. Carson's timber and some timber that came off of your land—it belonged to Mr. Hunt. When I would haul that timber I used the money to buy feed and groceries for the men, pay the men off and pay for the equipment and stuff used on the equipment. I used some of that money on somebody else out there; I paid off the men and bought feed and equip-

ment for the job; casings, tubes and gas and oil. I got some money and H. A. Moody got some money. Our arrangement or agreement about that was, I was to get $4.00 a day for running the job, and the proceeds was to be divided, after the men and all was paid off the rest was to be divided between Hobby and myself. We did carry out that agreement. We would get our money near the 15th and 1st. I paid him some money. I paid him the money when we had our settlements every fifteen or thirty days. He would come to my home. Sometimes he would come there once a week; sometimes once a month and stayed up two or three weeks and worked on the job. When he worked he worked in the woods. He worked for me and himself; while he was working he drove a team. I stated he would come to my house when we would have those settlements. When I was paying him we would first figure up what we owed and pay the men and then we would divide the rest if there was any there, for a settlement. I paid him different amounts in cash; I signed a check over to him once.

"* * * I paid him out of money I made hauling logs for J. S. Hunt and Coulson-Bradley Lumber Company. As to what transactions I had with H. A. Moody in 1929 and 1930, well we just had an agreement that I was to buy one-half interest in one truck and two head of mules; I leased two head of mules out later—up there. I don't know how much money I paid first and last on the teams and trucks. As to what finally became of the teams and trucks I bought an interest in—he got dissatisfied in me; in 1931. And he came up there and wanted to take the teams and trucks away, and I told him he knew we had an account with Willis Mercantile Company. He was dissatisfied with the way the job was. I told him he could have my part of it and go, and we went up and talked to Mr. Paddock on the 5th day of June; and I went up there and agreed to turn everything over to him on the 5th day of June. I know that is the account sued on.

"* * * Looking at this entire account— it was never marked paid up, but it was paid up—up until the time they had the books posted. Like this account here—$34.55 that was not paid, but this $3.20 was not posted. Every time I paid them I still owed them some more after I paid them.

"Q. Then why did you give Hobby—if you were not to split until all accounts were paid? A. He wanted me—

"I stated under the partnership agreement that I was not to get any money until all accounts were paid and I got $4.00. A. He wanted it and needed—. I am a cousin to Hobby. I do not have any property—wife and two kids, if you call that property.

"* * * When I had the agreement with H. A. Moody, that is the time when the account was started and both of us was responsible for it. It covered what both bought on the account up to the 5th day of June, 1931, after that I had no occasion to check it."

"On the 5th day of June when we made an agreement for Hobby to take this account over he agreed to take it all over and afterwards he objected to some of the things as being personal accounts and Mr. Paddock and Watson—the bookkeeper was to take $52.00 off of this account and apply it to a personal account of mine after that. That was after he had made an agreement to the whole account.

"* * * When we first began operations up there, me and Hobby Moody, we operated at a profit. There was no objection as to the division of money when we were operating at a profit. There was not any objection when there was any division to be made. When I went in the red is when he objected to keeping it up any longer."

Discussing a trip with H. A. Moody for the purpose of buying timber, W. E. Moody testified as follows: "We did not talk to anybody on that trip, me and Hobby Moody, only among ourselves. We were buying this timber to haul logs; to haul logs for J. S. Hunt."

Mr. J. S. Hunt testified: "I know this Mr. Moody here. I don't remember the date he was in there, but he and Ernest Moody come into my office just about the time they were hauling the last of the logs and began to ask a bunch of questions and I remember I talked pretty short to him. I didn't know who he was and like to unloaded on him. It seemed he was interested in the account—it was going into the red and he wanted to know something about it. It was the account of Ernest Moody. Ernest Moody is the same as W. E. Moody. And he wanted to know something about the account."

Mr. M. E. Paddock testified: "My name is M. E. Paddock. I am a stockholder and one of the officers in the Watson Paddock Company and Willis Mercantile Company. I know H. A. Moody. I know W. E. Moody. I know of this account made in 1929 or 1930 with the Watson Paddock Company and Willis Mercantile Company. As to whether I ever had occasion to talk to Mr. Hobby Moody at any time with reference to the W. E. Moody account, and if so, where I had that

conversation—Hobby Moody, Ernest Moody and Frank Peebles came up to my house one Sunday and Hobby said he was ready to take over our account now; that him and Ernest were going to dissolve at that time. They were hauling timber for me and he said Frank Peebles would take charge of the truck Monday morning; and I also had a big truck of timber and Hobby said: 'If you will let me haul it I will pay the account'. He had reference to Ernest and Hobby's account. That was in 1930. It was along in the middle of the year; about June. That took place at my house in Willis. After that time I came down here two or three times and got Kuykendall to go over to Hobby's house with me and I asked Hobby to pay some money on the account and he said he didn't have it. He said he had moved his truck over to New Caney and went to haul logs over there. I asked him what he did with the money and he said he was going to take the money and pay for the truck. I asked him to sign a note and he said hell no he had enough notes. He said he would pay the account when he got the money. That was in June or July. At the time he made that remark he was speaking of the W. E. Moody and Hobby Moody account at Willis. That is the account sued upon here in this suit; Watson Paddock Company and Willis Mercantile Company accounts."

Mr. W. Kuykendall testified: "I have been sworn. My name is W. Kuykendall. I live in Conroe. I know Mr. Paddock here and Mr. Watson. I was working for them at this time. I was working for Mr. Paddock in 1929 and 1930. I know H. A. Moody, Hobby Moody, and W. E. Moody. I saw those two men somewhere during the year of 1929 up at Willis; they called on me. My first acquaintance was with Hobby Moody; one day him and Ernest Moody drove up in a Ford—Ford touring car. Ernest Moody introduced me to him; called me out, they had some car trouble. Ernest Moody called me out and said, 'I want you to meet my partner, Mr. Hobby Moody'. We got in the car and drove down close to Hunt's sawmill. He had a field coil dragging on the magneto and we talked about fixing the car up; how much it would cost and so on. I don't remember about what time of the year that was; it was sometime in '29. I don't remember whether it was in the summer, fall or winter. I have seen him there in Willis several times since then. I have seen him in Conroe. I first seen him passing around town. I had occasion to go to his house with Mr. Paddock. I know M.

E. Paddock, the gentleman here, of the Willis Mercantile Company. Mr. Paddock came to me—we went to Hobby Moody's. After we got down there I heard some conversation between Hobby Moody and Mr. Paddock. Mr. Paddock asked him about the account they owed up at Willis; and asked him if he could make any arrangement to pay the account and he told him no, not now he couldn't. Finally Mr. Paddock asked him if he would sign a note on the account and he said no he wouldn't—not then. As well as I understood he said he had done signed too many notes. As well as I remember Judge he said he would take that over there whenever he could or would try to or—I don't remember about it."

As against the instructed verdict, the evidence must be construed most favorably to appellant, and, for the purpose of this appeal, all the testimony offered by him must be considered by us as true. Moreman v. Armour & Co. (Tex. Civ. App.) 65 S.W.(2d) 334; Texas & Southwestern Digest, Appeal and Error, ▮▮▮ Thus construed, the testimony we have quoted above satisfactorily raised the issue of partnership.

It follows that the judgment of the lower court must be reversed and the cause remanded for a new trial.

Reversed and remanded.